Thank you, Your Honor. Evan Tager for Appellants Paul Revere and Unum Provenant. The Arizona Supreme Court has made crystal clear that the standard for punitive liability is extraordinarily high. In that court's seminal case, Linthicum v. Nationwide, the court explained, the extraordinary civil remedy of punitive damages should be appropriately restricted to only the most egregious of wrongs. It continued that it is the evil mind that distinguishes action justifying the imposition of punitive damages. In short, the court held, before a jury may award punitive damages, there must be evidence of an evil mind and aggravated and outrageous conduct. Moreover, because the remedy is only to be awarded in the most egregious of cases, where there is reprehensible conduct combined with an evil mind over and above that required for commission of a tort, the court held that it was appropriate to impose a more stringent standard of proof than the ordinary preponderance of evidence, and therefore adopted the clear and convincing evidence standard. Now, we submit, Your Honors, that it is impossible to review the record in this case and conclude that Arizona's high standard for punitive damages were satisfied here. To begin with, this is not a case in which an insurer made a rash judgment not to pay a claimant and then made up a bunch of pretextual reasons for denying the claim. Instead, defendants paid Mr. Greenberg's claim for 8 years, over the course of which a picture eventually developed of someone who was actively attempting to deceive them about his condition. The claims file in this case that the defendants had before them when they were analyzing his claim is replete with red flags, evidence of someone who was trying to malinger, to deceive them, to distort. And all of this evidence in the claims file by the end of the time that they were handling his claim became essentially undisputed. Let me just go through a few of the most central ones that were confronting the defendants when they were making his claim. First, Mr. Greenberg lied on his application for insurance by not mentioning preexisting manifestations of his condition, not mentioning previous driving infractions and not mentioning prior illegal drug use. Second, although he began seeing a doctor for his emotional condition several months before he filed his claim, he waited out the 2-year contestability period, that is, the period during which the company had a right to challenge his application as being false and thereby rescinded. Well, you could have challenged that any time during the 2-year period. Isn't that right? Right, but ordinarily. You could have investigated Mr. What's-his-name? Greenberg. Greenberg. Greenberg. I'm sorry. He's still on the prior cases. You could have investigated Mr. Greenberg all you wanted. Well, as a practical matter, a company that's selling hundreds of thousands of policies can't possibly investigate everyone to the hilt. But in any event, that's really beside the point to the issue in this case. Well, that's not the reason why you denied him and why you terminated his benefits, is it? No, no, no. Absolutely. We couldn't have because he didn't file until he didn't. He very cleverly did not file his claim until a few weeks after the contestability period had expired. So they paid him, and they paid him for 8 years. But this is one of the little jigsaw puzzle pieces that was placed in the case. Before you paid him benefits, he was pretty thoroughly evaluated, wasn't he? No. They don't. They don't. But they just paid him benefits. I mean, when he applied for benefits, they just paid him without making a determination that he was he had met the test for disability under the policy? Well, yes. They received his claims form and his attending physician statement, and it was sort of like a prima facie kind of thing. They basically decided on the basis of that, even though they did very early in the claim have some reservations, partly because of this timing thing and partly because it was becoming clear to them very early on that he had made misstatements on his application. They had reservations, but they said, you know, we're going to give him the benefit of the doubt. We're going to put him on claim. We're going to start paying him. That's not evidence of bad faith. That's not evidence of outrageous conduct or evil mind. That's quite the opposite. So you determined that he satisfied the test for disability? In essence, they decided that they were going to Otherwise you wouldn't have paid him benefits. Well, they decided that there was enough there at the beginning to justify putting him on claim. But then they did begin to try to investigate the claim. It's just that, like a good insurer should, they weren't going to hold him up for months and months and months while they were investigating him. Instead, they put him on claim right away. This is evidence of good company here, not a company that deserves to be punished with punitive damages. Do you plan to own Paul Revere for this whole eight years? No. And without punitive damages? It would have been very late in the period, probably. I know my It's been about the time that you About 1999. This is about the time that you set out to investigate this more intense investigation before they became involved. Well, the first IME that was performed on him, I believe, was in 1994. And I was about to My third red flag in the file has to do with that first IME where he basically so sabotaged the MMPI he received that the first psychologist who performed it concluded that he was malingering it. Well, you said that you paid him for eight years and then decided to take a look at it so this wasn't evidence of evil mind because you paid him. Oh, no, no. I'm not saying it was sort of like all of a sudden after eight years they decided to take a close look at this. This was something that was slowly developing over time. There were things going on in the claims file. They sent them out for this first IME. The IME came back saying this man's a psychotic based on some of the things he said on his exam. Now, of course, his own treating physicians didn't say he was a psychotic. There was a big question in the company's mind. How can it be that he tests like someone who's got a serious psychotic disease and have his own attending physician saying he's simply got some anxiety disorder and dysthymia. So that was the red flag. But, again, they submitted it to they sent that conclusion to his attending physicians. They said, no, no, no, it's just because we take such good care of him that he's able to function so well when we have him. So they said, okay, we'll put him back on claim or we'll keep him on claim. They didn't do anything to him then. But then over time, they decided that there was sufficient inconsistencies in the file. They would send him out for a second IME. So the second IME comes around. And, again, he is so uncooperative on his MMPI that the doctor who administered it had to conclude that it was invalid. Then in conjunction with that second IME, he's sent out for a bunch of other cognitive tests. In essence, for a third time. And the psychologist who performed those concluded that he tested as borderline retarded. Now, if you watch the tape of his four-hour interview, the one thing he is not is borderline retarded. This man is extremely intelligent. So the conclusion of that psychologist. He was a stockbroker. Yes, he was. And then an insurance salesman. He plays basketball. He coaches basketball. He's actively engaged in conversations about sports with various treating physicians. So someone who tests borderline retarded on a test is trying to sabotage it. And that was the conclusion of Dr. Wilson. He was maligning the test. So then he goes and in the course of this, he has his interview with Dr. Pitt, the actual IME doctor. And Dr. Pitt. Back when? In 1994? Pardon me? What time period are we talking about? This is back right before the claim was denied in 99. When was this? I believe this is 99. Oh, I'm sorry. 98. Is this when? When did Provident take over? You mean UNUM? Yeah, UNUM. UNUM, U-N-U-M. 1999. 1999. So this was before. In other words, I guess one of the things that comes to mind is that, you know, UNUM, huh, took over Revere. And then was it at that time that UNUM said, well, you know, we've got to look around, see where we're going. We could start saving some money. And then they lighted on his file. Well, temporarily it doesn't work because of all of the things I mentioned. That's all. No. I mean, the answer is no. Okay. And there's not a stitch of evidence in the file, in the case, by the way, that any change in practice happened or any orders were given or anything happened as a result of the merger. But what you're telling us now, I'm assuming, was argued to the jury. Well, yes, of course. But, you know, my response to that, Your Honor, is the same thing happened in Linthicum. Velasky, the Ninth Circuit's case, Lange, all of those cases were cases in which juries awarded punitive damages against defendants in Arizona bad faith cases. And in all of those cases, the courts, the first two were Arizona Supreme Court. The third is this Court, said, you know what? This doesn't meet our standard for punitive liability. We don't care what the jury found. We believe there needs to be a clear demarcation between bad faith and punitive liability. And these cases don't meet it. Now, I submit to you. But what is that line? There has to be clear and convincing evidence of outrageous conduct and an evil mind. Was the jury properly instructed on the standards they had to meet? I think the instructions to meet? We're not challenging the instructions. I think the jury was adequately instructed on the clear and convincing standard and the evil mind and all of that. But that was the case in some of the Arizona cases as well. I think if you would read those cases and hold up the facts of this case to those, you could not come away from it and conclude that you can sustain this consistently with those. If you look at the other Arizona cases, the few that have upheld punitive damages, there have been strong plus factors that are absent here. The Hawkins v. Allstate case, you had three former employees who said, we have a policy across the board. We are going to impose this fee on total wrecked vehicles. And it doesn't matter whether they actually – it was a cleaning fee and also a fee for tire wear. It didn't matter how old the tires were. It didn't matter whether the car was clean or dirty. They were going to do that across the board. And that was the basis for the Court to conclude there was sufficient evidence for punitive liability and affirmative policy to cheat the policyholders. The Bradshaw case was a case in which there was evidence in the file that they were bringing this – they were going to bring this claim – it was a malicious prosecution case. And they basically did it for purposes of trying to – to strong-arm the plaintiff in the case against them and force a settlement. So there was evidence, affirmative evidence, in the file of an improper motive. There is nothing in the entire file of this case which is very substantial. There is not a single piece of affirmative evidence of malintent on the part of this insurer. The evidence in this case is that Mr. Greenberg was throwing up all of the smoke trying to deceive this company. There is no other conclusion than that. You even have an officer of the court, Greg Davis, an Arizona lawyer, who on a subpoena from the Arizona Insurance Department said, Mr. Greenberg told me that he manipulates his medication in order to appear to be – to exacerbate his condition whenever he's being examined for doctor for purposes of his insurance claim. All of that was what was confronting this company in the file. There is no affirmative evidence that they were out to get him, that they – that they had any intent other than – other than to handle his claim fairly. But basically, because of the things he had done, the things for which he was responsible, that's how this decision got made. Do you object to the submission? I've forgotten from the briefing. Do you object to the submission of punitives to the jury? Absolutely. But you found nothing wrong with the instruction that was given, but you didn't submit it. It was a JMOL motion, and the judge took it under advisement and then denied it at the end of the trial. And if I – I know I'm running deep into my time here because this is such an interesting issue, let me just quickly tell you what it is that caused the judge to uphold it. Basically, the judge felt that malintent could be inferred from the fact that there was this informant who had called the company and ratted him out, and they gave his allegations to Dr. Pitt, who performed the IMA. And they didn't tell Dr. Pitt that there was personal animosity between these two men and that the credibility of the informant was subject to question, nor did they provide to Mr. Greenberg and his physicians the transcript of this interview they had with this informant whose name was David Goldfarb. That was the basis for the punitive award. Now, the problem here is that there's no evidence that any of these things were done intentionally with the evil mind that is required under Arizona law. There's a serious, serious question. One could infer that they were attempting to bias the doctor's opinion. Well, I don't – That's a reason – you can draw reasonable inferences from all the evidence. Well, I – first of all, you have to look at it in the context of this overall the way they handled it. So I think to the extent that there is – that it's possible to draw any inference at all from that about what – You'd agree you can draw – the jury is entitled to draw reasons. The jury can draw inferences. Our contention, Your Honor, is that this inference – But when you challenge the verdict, when you challenge a jury's verdict on evidence, substantial evidence grounds, we draw all reasonable inferences in favor of upholding the verdict. Your Honor, this inference is so attenuated and so inconsistent with everything else in the file that it can't possibly meet the standard for punitive liability. If that kind of inference were sufficient, then all of the Arizona cases I've talked to you about would have to be decided the other way. In the course of an eight-year claim that is ultimately denied, there is going to be things in the file – if you're going to have a bad faith verdict, there are going to be things that someone says were done wrong. If all it takes is to say, well, the jury is entitled to infer from that that they were done on purpose, the clear and convincing standard means nothing. Now, let me mention that the Arizona Supreme Court in the Fulaski case – But you've got to take this evidence, you know, in the context of the whole trial. That's correct. You don't pull a piece out. That's right. You can't just take – In the context of this whole trial, what they observed and everybody's in the courtroom, what they heard, all the evidence. They could have, you know, come to that conclusion. I don't think any reasonable juror could come to that conclusion, Your Honor. It is in the face of all that other evidence, in the absence of any evidence that that actually was his intent, the man who sent this to Dr. Pitt. Dr. Pitt testifying that, you know what, this is helpful to me. This helps answer some of the questions that I had about inconsistencies in his performance during my interview with him. It is – it is a major question whether it was even wrongful to give him this report, much less that it was malintent to do so. And we'll – if the Court will allow me, we'll get to that when we get to the expert witness question. Let me quickly turn to the excessiveness question. I really don't think you should get to that question. I really think there should be – Why don't you just say let's turn to the excessiveness question. Pardon? Just say let's turn to the excessiveness issue. We're burning time. Yes, Your Honor. Your task on the excessiveness question, it seems to me, is very simple. The Supreme Court decided in State Farm – State Farm, as you know, is an insurance bad faith case. They held that under the facts of that case, which involved a third-party bad faith claim in which the company deliberately tampered with the claims file, lied to the house because they weren't going to cover the difference. In that case, the Court said under the circumstances of that case, no more than a one-to-one ratio of punitive to compensatory damages was permissible. We would submit to Your Honors that all you need to do is compare the facts of this case to that – to State Farm, and the conclusion is inescapable that no more than a one-to-one ratio was permissible here as well. That's all I think I need to say about that point. We've briefed it pretty extensively. Third, on future benefits, because I am running short on my time here, the point there is that it's a – you're writing on a blank slate there. There's no Arizona law on the issue. It would certainly be appropriate to certify it, but if you're going to decide that more like the trespass paradigm or more like the personal injury paradigm. We've discussed that in the briefs, and we would submit that it's just like the trespass paradigm in which once you have a final judicial determination of a trespass, you get your past damages for the trespass, but all future damages for future trespasses have to be awarded in subsequent lawsuits. The final issue I'd like to touch on briefly is the expert issue I mentioned before. The basic bottom line there is that the trial judge failed to perform her duty under Kumho and Daubert to test the reliability of the ipsedixic statements of the plaintiff's witness, the plaintiff's expert. Basically, he got up there, he said all kinds of things that the defendants did in his claim were improper, outrageously improper, blah, blah, blah, examples. It was improper to provide Pitt with Goldfarb's statement. It was improper for the in-house consultant to discuss Dr. Pitt's conclusions with him before he wrote the report or before he reduced them to writing. It was improper not to tell Greenberg about Goldfarb's allegations, and it was improper not to provide the videotape of the IME interview to Mr. Greenberg's physicians and only provide him with the transcript. Where did he get this stuff? He made it up. He couldn't cite to a single rule, statute, treatise, article, nothing. All he did was say it's my experience, it's my say-so. If Kumho and Daubert mean anything, it's that an expert can't get up and basically serve as the mouthpiece for the lawyers to articulate their litigation theories and dress it up in the garb of expertise. Thank you, Your Honors. Thank you. Good morning. May it please the Court. My name is Ken Friedman. I'm Mr. Greenberg's attorney, and I was a trial attorney for him as well. The appellant maintained this morning that it's impossible for anyone to look at these facts and find punitive liability under Arizona law. Despite the fact that the trial court looked at these facts and found liability and eight jurors unanimously found liability being properly instructed onto the standard, including clear and convincing, including that it must be evidence of an evil mind, this is a very factual, specific case. It had gone through trial. It took about two weeks to get all the evidence in front of the trial. It's axiomatic. A jury can determine the facts in a case, but a corollary of that axiom is the jury can decide the importance of the facts in the case. It's not the court's job to say the jury should have found these red flags to be important. The jury is free to say these weren't important. And not only that, the jury is free to say we don't think that's what motivated the company here. We don't think they were motivated by these alleged red flags that are argued on appeal. The jury is free to say we think they were motivated by malice or an evil mind. One fact that supports that, my colleague argued, there's not a single piece of affirmative evidence of malice. Dr. Pitt was asked, did Paul Revere try to influence your decision in this case? Did they try to bias you? And he said, not overtly. So I asked him, what do you mean not overtly? Did they try to covertly influence your decision in this case? He said, Mr. Iannetti, and this is quoted verbatim in our brief, I'm paraphrasing now, Mr. Iannetti, I've worked with him in the past and I've worked with people like him at insurance companies. They tend to believe that everyone's malingering when that is not, in fact, the case. That's an affirmative evidence that a jury can infer that Mr. Iannetti tried to bias the process. It doesn't matter that he cleverly tries to bias the process or effectively tries to bias the process. But if he is trying to influence Dr. Pitt's opinion, then how can we rely on his analysis when he gets Dr. Pitt's opinion to reliably look at it fairly? And, of course, there's the evidence that in their own file, they knew that Mr. Goldfarb had been accused of defrauding people out of millions of dollars and that Mr. Greenberg was a witness against him. They knew specifically the animosity, the bias, and the fact that Mr. Goldfarb had independent problems with credibility because he's a fraud. They didn't tell Dr. Pitt any of that. They told Dr. Pitt, Goldfarb's making these allegations against Greenberg. Dr. Pitt relies on that and doesn't ever hear how bad the animosity is and how much Goldfarb's credibility should be challenged. In their own special investigation report of Goldfarb, the claim file in this case shows everything we get from Goldfarb, Goldfarb should be treated with suspect and suspicion and not acted upon without independent cooperation. But they didn't tell Dr. Pitt that. So there is ample evidence where a jury could infer and did infer in this case that there was malice enough to support punitive damages. Remember in this case, the bad faith finding is not appealed. In this case, it's a verity that the company acted in bad faith. It's enough for bad faith to disregard the three treating physicians, the two IME doctors and your in-house medical consultant who prior to Dr. Pitt had all found Mr. Greenberg to be totally disabled. That would support a bad faith verdict, probably not a punitive verdict. But what does support the punitive verdict is the evidence that was affirmatively in this case showing that they had malice. And that's what distinguishes the other cases in Arizona. They don't balance and weigh the evidence in the cases where they throw out punitive damages in Arizona. What they find is there's no evidence to support it. And if there's no evidence, then it doesn't support it and it should be knocked out. If there's some evidence and some evidence that justifies it, no court has had as a matter of law those justifications outweigh the allegations of malice. No Arizona court has ever done that weighing. They've looked at the evidence and said if there's nothing there, we'll throw out the punitives. In this case, there is something there. There are justifications put up at trial. These issues were vigorously debated. And it's up to the jury during their deliberations to come to the conclusions, which they did in this case. Once punitive damages are awarded, and it's cited in our brief, but the Garul case versus Illinois Mutual Life and Casualty, that's one of the cases where they threw out punitive damages. And they said in that case, there's no punitive damage as appropriate in this case because, quote, there was no evidence to justify an inference that Illinois Mutual arranged for IMEs with disreputable doctors, or there was no evidence to justify or, quote, tried to influence the doctor's opinions or purposely withheld information from them. So the court in Garul versus Illinois Mutual specifically addressed our situation. So there's enough evidence to support punitive damages in Arizona. The jury was properly instructed. The judge ruled on it. The district court judge ruled on it pre-trial, during trial, and in post-trial motions. She fully and fairly considered their arguments and ruled in favor of Mr. Greenberg on those issues and upheld the jury's award. Now the defendants are arguing that Campbell versus State Farm mandates a one-to-one ratio. If you look at the Campbell decision as well as the TXO decision as well as the BMW decision, the court went out of its way to say we are not imposing a rigid ratio on punitive damages cases. In fact, in TXO, they said there is a presumption. If the process was fair, there's a presumption that punitive damages are valid. And you only get in trouble if they're grossly excessive. I don't think the Supreme Court wants the federal judiciary saying, is this a case where there's a million dollars of outrage is okay, but not two billion? I don't think they want to draw that kind of fine line. I think they say there's a presumption of validity if the law is instructed or if the jury is instructed correctly. And we're only going to take a close look or raise a judicial eyebrow when it's not. But I think it's fair to say that it's not excessive. We have a four-to-one ratio in this case. This Court just recently, last August, ruled in Zhang versus American Gem Seafood that a seven-to-one ratio was not excessive under Campbell, BMW or Cooper Industries. You have to include the future damages. Well, you do. Policy benefits, but four-to-one, right? You do. And they argue that the District Court erred as a matter of law in letting that go to the jury. It seems to be conceded there's no Arizona case that says it was error to do so. Arizona appellate courts have never ruled on that issue. California, it's been settled law since 1980 under the Egan decision that you get future benefits. That decision has not been roundly criticized or subject to any kind of a ---- But let me ask you this. I don't know Arizona law, insurance, you know, litigation all that well. But did the California ---- but did the Arizona appellate courts and the Arizona Supreme Court, did they sort of look to California, you know, just for ---- you know, not for ---- certainly not binding, but did they sort of look at California and sort of see what California is up to? Yes. They have several times in the past. Adopting the tort of bad faith, they looked at California law. Deciding that you can have a bad faith cause of action without a breach of contract, they looked at California law. There are three or four cases where they specifically turned to California law, and those are cited in our brief. I notice in the district court's order here, when she denied the ---- I guess the Rule 50B motion and the motion for a new trial, she pointed to the Egan decision. Yes. And looked to that for guidance. And it makes sense here. In the brief and in today's argument, the company would like you to say, well, it's enough of a remedy that he can sue again. Well, insurance bad faith, remember, is really a trust relationship. Under Ace v. Aetna from this circuit, you're buying peace of mind. And with a finding of bad faith that's not even challenged, that Mr. Greenberg's benefits were cut off without a reasonable basis, it's not a solution to say, okay, you're back in a position of trust with this company, and when you go to the mailbox every month, you can be sure your check's going to be there. This company's been found guilty of wrongdoing that they don't challenge on appeal. And it's not the position of this Court to put them back at the mercy of that company. Remember, the benefits were cut off in 1998. His trial didn't end until 2001. During that time, he received no benefits. If he has to sue again, it's another three years where he receives no benefits. The record in this case shows his house was in foreclosure. His electricity had been turned off. His doctor testified to the extreme emotional distress that he went through. His wife testified to it. When he was cut off of benefits, he was unable to work. His condition deteriorated. I don't think it's an answer to say this jury can't award future benefits. You're back at the mercy of the company, and you can trust us to do the right thing in the future. In addition, in this case, the jury asked the question, what happens if we don't award future benefits? And if you want a repudiation of the contract, based on the insistence of the defendants, they were instructed he would have to file a new claim for benefits, and his occupation will be considered that whatever occupation he's doing when he files the new claim. So he loses the ability to have a disability claim as a stockbroker, according to the company in this case. So they have breached the contract, they've repudiated the contract, and Mr. Greenberg should not have to be at their mercy in the future. And there's nothing inconsistent in Arizona law. We have a district court judge who sits in Phoenix, who knows Arizona law, and filed the appropriate procedures and give it considerable thought. This is not a case where these issues flew under the radar. Again, that issue was raised pretrial, during trial, and post-trial. So it was well explored by the trial court. And finally, the jury found what they needed to find. More likely than not that Mr. Greenberg will never work as a stockbroker again. His doctors testified to that, that it would be imprudent for him to even try to go back to work to such a stressful position. So we – the law allows it, and we met the factual burden to prove it, and the jury was free to reach the conclusions the jury reached. Going back to the Zang v. American Gem seafood case, so we went off on the future benefit issue because that keeps the ratio at 4 to 1. I would submit that even without that, the ratio is not excessive. It would be what, about 11 to 1? What would it be? It would be $2.4 million on $140,000, $150,000. So it would be more than 11 to 1. I have it someplace. What you're not seeing is 150 to 1 or 500 to 1, those kind of grossly excessive ratios. And you've got to remember, this is not a case of a bad paint job or even somebody who worries about an excess verdict. This is somebody who contracted to be paid every month in the event he was too sick to work. He met that definition. He was too sick to work, and they cut off his lifeline. So you have severe emotional and financial distress that would support a pretty significant punitive damage award. I would argue that $2.4 million is a substantial award but not grossly outrageous that would raise the judicial eyebrows of the Supreme Court. They still, in all these decisions, give deference to the right of a State to regulate the conduct through punitive damages for the goals of deterrence and punishment. It could be argued it wasn't even high enough in this case because the company doesn't seem to be deterred or apologetic about their behavior in this case. They continue to defend it, that there was really nothing significantly done wrong in this case. They need to hear from the jury and I suppose from this Court as well that there was conduct that was improper in this case that would justify Arizona's goals of punishment and deterrent. Well, I don't think they claim that it was excessive under Arizona law. They don't. They claim it's excessive under the U.S. Constitution. And that's a stopgap. And that, I think, from the U.S. Supreme Court cases, is very clear. It's meant for the outrageous and unusual case. You know, $2 million for a bad paint job, for example. This is somebody who was at the mercy of their insurance company, someone they paid premiums for, premiums to, in the event something happened to them. And I think it is more egregious than most. The size of the award is not enough to raise the issues that State Farm or the other cases raise. One issue I wanted to touch on, even though Mr. Tagere did not this morning, is the limited in some respects. Dr. Pitt was the IME doctor. He was not an independent expert for trial. And he was deposed by Mr. Greenberg during the trial while Mr. Greenberg was going forward pro se. The judge ruled if you want Dr. Pitt to testify about his opinion of Mr. Greenberg's deposition skills, he should have disclosed it. And the brief seemed to talk a lot about a written report under Rule 26. And I think the better practice would be to issue a written report under Rule 26 if you want Dr. Pitt to be an expert on that subject. But the judge's opinion did not turn on whether or not a report was necessary. It turned on whether or not disclosure was necessary. Dr. Pitt was disclosed early on under Rule 26 as someone who's going to testify about the facts surrounding his IME. And significantly, right before trial in the final pretrial order, the defendants identified Dr. Pitt again, a week or two before trial, as somebody who's going to testify about the IME and the opinions he expressed in his deposition. That would have been the time to raise the issue if they wanted to expand the scope of Dr. Pitt's testimony. They did not do so. Therefore, I think the judge was entirely within her discretion to say it's limited to what you disclosed. It is not improper to keep him from going farther than that. And they acknowledged in their argument about Dr. Pitt that it would be subject to a Daubert analysis. And yet they found nothing unusual about Dr. Pitt's professed ability as a forensic psychiatrist to diagnose somebody from their behavior in a deposition. Now, I don't know where Daubert says or what scientific studies say forensic psychiatrists can evaluate people based on their performance in a deposition. I don't think it would have met the Daubert standard. But if that kind of testimony would, I can't see how Mr. Kelly's testimony wouldn't. Mr. Kelly was an insurance claims expert so found by the court. He spent his entire career working for insurance companies. Based on a motion of the defendants, he was restricted from testifying about what the law was. So now they come forward and say, well, he gave his opinions, but he didn't say what the basis of his opinions were. Well, he was prohibited from saying the law requires this or the law requires that. What Judge Bolton said is he can talk about what the industry standards are. I will instruct the jury as to the law. And I think that was a correct ruling on her part. So when Mr. Kelly testified, he testified as an experienced insurance professional about what insurance companies do and don't do when they adjust a claim in trying to act in good faith. They don't try to bias IME doctors. They don't withhold information from their customers. Things like that. None of his opinions seem to me that controversial. They also are backed up by the record in this case. Despite Daubert and the other cases, cross-examination is still the preferred method of going after an expert that you think is saying something that is incredible. They cross-examined Mr. Kelly at length. They also were free to call their own expert. If they had an expert who was an insurance industry specialist who could say they didn't do anything wrong, they were free to call them. So instead, they're attacking the verdict and attacking the court's ruling allowing the testimony of Mr. Kelly. I think almost every issue raised by the defendants in this case can be characterized as within the trial court's discretion or within the jury's discretion. This case was decided where it should have been decided by a properly instructed jury during their deliberations. The trial court, pre-trial and post-trial, did her job in making sure the process was fair and the jury was properly instructed. There is nothing in this case that requires a new trial or reversal. And if the Court doesn't have any further questions, then I will submit on the balance of my time. Thank you. Thank you. We'll give you a few minutes for rebuttal. I wrote down an awful lot of things, and I'll see how many I can get through before I wear out my welcome. The point about Dr. Pitt saying that he believed that Mr. Iannetti was covertly attempting to bias him, that's perhaps the best evidence in the case that our intentions were good. Iannetti hired a man who was so independent and so distrustful of insurance companies that he would say at trial that he thought all insurance personnel are out to try to save money on claims. That's the man Iannetti picked. He picked him on the basis of the fact he had done one prior IME for that company and he had recommended paying the claim. So the idea that this testimony by Pitt that I distrust all these guys, they're all trying to save money on claims. See, this is a – you're making a jury argument. Well, Your Honor – No. You just – okay. You made that point. So give me the rest of it. Well, I need to respond to the jury argument point. The clear and convincing standard is a high standard. It's designed to sort out little things from big things. You have to have very powerful evidence. It can't be slate and inconclusive, which is the language that is used in Fulaski v. Preferred Risk, one of the Arizona cases I told you about. When you take the totality of the evidence in this case, you can't just pull out this one couple of sentences that Pitt said at trial and say, okay, there's the clear and convincing evidence. It just can't outweigh everything else that indicates that this insurance company was acting in good faith and had no evil mind in the handling of the claim. Well, I think all we got was one example here. I didn't take that to mean that that was all the evidence in the case. I think if you go back and read the briefs, you'll find that they don't have anything besides that in terms of where's the evidence of malintent. That's all they have. They want you to infer it from the mere fact that the Goldfarb allegations were provided to Dr. Pitt and that, allegedly, they didn't tell Dr. Pitt that Goldfarb had credibility questions. Well, Dr. Pitt says in his report, I know these guys are adverse in litigation. I know that I am loathe to put weight on his allegations. Moreover, it is undeniable that a substantial number of the things that Goldfarb said are corroborated in the claims file. Things like he knew the kinds of crazy answers that Mr. Greenberg gave on the Rorschach test, that he basically, it was a test he threw. He knew it. It was in the doctor's report, the very same. He talked about inability to spell the word world backwards, which is a standard test in these MMPIs. He had so many things in his statements that were corroborated in the claims file, that even if he had credibility problems, it's sort of like the situation in which you say, well, you may be paranoid, but that doesn't mean someone's not trying to get you. In this case, he may have hated Greenberg. You know, they were good friends. They had a falling out. He may have hated him, but that doesn't mean he wasn't telling the truth. Let me ask you a question. How do you spell world backwards? How do you spell world backwards? Very carefully. Very carefully. D-L-R-O-W. Did I get it right? The point, though. You need to move to the head of the class. The point, though, Your Honor, is not whether he succeeded or failed. The point is that was something that the diagnostician found problematic, that he couldn't do it, and it was something that was in Goldfarb's, his interview notes. So the point is that to make a whole lot of the fact that they provided this stuff to Dr. Pitt as if it was totally fraudulent. I mean, it has so many similarities to what's in the claims file already that, you know, there's no basis for concluding that they had an evil mind by giving this to the man they were asking for his independent opinion. On the State Farm excessiveness issue, I think if you read Part 2 of State Farm, that's where the Court says, look, we are trying to get rid of arbitrariness in the imposition of punitive damages. The argument that Mr. Friedman's making that, well, there's no mathematical this, there's no mathematical that, they want like cases to be treated alike. They want more egregious cases to have higher rewards than the less egregious cases. So the idea that you shouldn't compare the conduct in this case to the conduct in State Farm and then make a decision about whether the ratio is excessive is totally inconsistent with Part 2 of State Farm. Zhang, by the way, we had Rule 28J letters on Zhang. You'll find them in the files. The panel that decided it thought that racial discrimination is so historically abhorrent that it could warrant a higher ratio than, for example, State Farm itself. It made that comparison itself. So we think, you know, Zhang helps us by pointing out that State Farm and bad faith cases like it are one-to-one and below cases. And racial discrimination and stuff like that is where you get to higher ratios. On the subject of borrowing law from California, I would counsel caution on that. I didn't mean to use the term borrowing. I just said they look to California. Well, they do sometimes. If you look at Linthicum, the punitive damages case, they look to Maine law. So, I mean, they look for places where, you know, guidance can be found, like any good court would. But Egan is a case that says you look at the circumstances. Egan said, look, it's not foreclosed in all circumstances. Our position here is that under the circumstances of this case where he could potentially go back to work, there was all kinds of things that could happen. There was no indication that if there was a final judicial determination that there was bad faith, that we would refuse to put him back on claim. There was no evidence of that, no testimony, no instruction, and the instruction to which Mr. Friedman refers is not accurate. The instruction was that it would be up to the defendants to decide whether to put him on claim. It was not defendants are not going to put him on claim and they're not going to consider his prior occupation as a stockbroker. It was a question that was asked when our counsel didn't have access to the client, and it was not sort of your standard jury instruction that's given at the close of all the evidence after the parties have briefed it and thought about it. So it's not equivalent to saying the jury made a factual finding that if he was found to be totally disabled and it was bad faith, that this company would not put him on claim and would not pay future payments as they became. Were you the trial lawyer in this case? No, sir. He is here, however. You've got so much passion in this. That may be a word. Well, I'm a passionate representative of my client. I'm passionate about punitive damages. I believe they need to be, I believe like the Arizona Supreme Court believes, that they need to be confined to cases of truly egregious conduct. A couple of last quick points. Another State Farm point, the suggestion that a 4-to-1 is just a free pass. The Supreme Court GVR'd several cases with ratios of less than 4-to-1, indicating that the Supreme Court doesn't think it's a free pass. Finally, on the subject of, well, Kelly was told he couldn't testify what the law is, that's a different point than saying he's allowed to make up standards without reference to any source from which they come. He admitted in his deposition that it was based solely on his experience and that he couldn't point to anything that he had ever seen anywhere to justify these assertions he was making. So that's where Cumhall and Daubert and Hankey and all of the other cases that address this come in. There has to be some test of reliability. You can't just allow these insurance bad faith experts to come into court and serve as the mouthpiece for the plaintiff's lawyers basically making their closing argument in the context of their testimony. Thank you, Your Honors. Thank you. And this case and all others is submitted. And the Court will adjourn until tomorrow morning, 9 o'clock. Wait. 8 o'clock. 8 o'clock tomorrow. 8 o'clock. We're adjourned. All rise for the 8 o'clock. 8 o'clock. The Court for this session stands adjourned. 8 o'clock. 8 o'clock.
judges: Pregerson, Beam, Paez